UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                  )
NATIONWIDE LIFE INSURANCE COMPANY, )
                                  )
                  Plaintiff,       )
                                  )
       vs.                         )      C.A. No. 09-235 S
                                  )
MANFRED STEINER and SHEILA STEINER, )
                                  )
                  Defendants.      )
_____)


**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Plaintiff Nationwide Life Insurance Company ("Nationwide") brought this action seeking a declaratory judgment that it has validly terminated an annuity it issued to Defendants Sheila and Manfred Steiner (the "Steiners"). The Steiners have counterclaimed for breach of contract. Both parties now move for judgment on the pleadings. The question to be resolved is whether a termination clause invoked by Nationwide in revoking the policy authorized that action. Because the Court concludes that it did not, it finds that Nationwide is liable for breaching the agreement.

I.   Background

The Steiners applied to purchase the annuity in question from Nationwide on March 18, 2008.   On the application form, they listed Manfred Steiner as the owner, Sheila Steiner as the beneficiary, and a woman named Sheryl Stroup as the annuitant.   An annuitant is the person whose life is designated as a measuring tool for an annuity policy.   (See Compl. Ex. B at 1-2 (hereinafter "Application").)   The application expressly asked the beneficiary to list his or her "Relationship to [the] Annuitant," but the Steiners left that question blank. (Id. at 2.)   Nationwide accepted the application anyway. In exchange for an initial payment of $1 million, it issued the Steiners' annuity on March 20, 2008.   (See Compl. Ex. A (hereinafter "Steiner Annuity").)

The features of the annuity in this case resemble those recently described by the Court in Western Reserve Life Assurance Co. of Ohio v. Conreal LLC, C.A. Nos. 09-470 S, 09-471 S, 09-472 S, 09-473 S, 09-502 S, 09-549 S, 09-564 S, --- F. Supp. 2d ---, 2010 WL 2222409, (D.R.I. June 2, 2010).[1]   Specifically, under the policy the owners are able

---

[1]   The Western Reserve matters involved annuity transactions in which the owners of the policies had

to invest the premiums in securities, and a "death benefit" provision guarantees the return of the cost of the policy upon redemption. Thus, when the annuitant dies, the owners can recover whatever they paid in, even if the market plummets and their investment has lost value. Stroup died on April 28, 2008, but the Steiners did not seek to redeem the policy until almost a year later, on March 19, 2009. At that time, the value of their investment had dropped substantially, and they demanded the death benefit to cover the loss.

Nationwide balked. After receiving the Steiners' request, it made two discoveries. First, it observed that her death certificate showed she had been suffering from metastatic lung cancer for "months." (See Pl.'s Mot. Ex. 1 at 5.) That meant the diagnosis must have been made before the Steiners sent their application a little more than a month earlier. In other words, she was terminally ill when they applied for the policy. Second, Nationwide realized it had issued a second annuity for which Stroup was the

recruited terminally-ill strangers to serve as annuitants. While it is not clear how the Steiners found the annuitant, it ultimately does not matter. As fully explained below, unlike in the Western Reserve disputes, which touched on questions of state insurance regulation and public policy, the claims in this case are squarely governed by the terms of the annuity contract itself.

annuitant on April 23, 2008; the owner of that policy is not a party to this action. These two facts, Nationwide decided, gave it the right to back out of the contract.

Nationwide therefore wrote to Manfred Steiner that it was rescinding the annuity, and enclosed a check for the "surrender value" of the contract. This consisted of the purchase price minus market losses — notably, without the addition of any death benefit to make up for the decline. (See Steiner Annuity at 4 (defining "surrender value").) The total amount was $481,418.15. Thus, at stake in this dispute is this: who eats the half-million dollar hit to the annuity portfolio, the Steiners or Nationwide?

To justify its actions, Nationwide relies on a termination clause in the annuity that provides as follows:

> In issuing this Contract, Nationwide intends to offer only annuity and related benefits (including death benefits) to single individuals and their beneficiaries. These benefits result in Nationwide assuming certain risks. This Contract is not intended for use by institutional investors, people trying to cover risks involving multiple lives with a single contract or by someone trying to cover a single life with multiple Nationwide contracts.
>
> If Nationwide discovers that the risk it intended to assume in issuing this Contract has been altered by any of the following, then Nationwide will take any action it feels is necessary to mitigate or eliminate the altered risk including,

> but not limited to, rescinding the Contract and
> returning the Surrender Value:
>
> (1)   Information provided by the Contract Owner(s)
>       is materially false, misleading, incomplete or
>       otherwise deficient.
>
> (2)   The Contract is being used with other
>       contracts issued by Nationwide to cover a
>       single life or risk.
>
>       . . . .
>
> Nationwide's failure to detect, mitigate or
> eliminate altered risk does not act as a waiver of
> its rights and does not bar Nationwide from
> asserting its rights at a future date.

(Steiner annuity at 7-8.)  Nationwide asserts two grounds for termination under this provision.  One, the Steiners' application was "materially . . . incomplete or otherwise deficient," because it did not state the relationship between the annuitant and the beneficiary.  (<u>Id.</u>)  Two, the Steiners' annuity was "being used with other contracts issued by Nationwide to cover a single life or risk," because of the second policy on Stroup's life.  (<u>Id.</u>)

Nationwide filed this action for a declaratory judgment validating its actions.  The Steiners counterclaimed for breach of contract, bad faith refusal to pay under the policy, tortious interference with contractual relations, and intentional infliction of emotional distress.  As noted above, the parties have

5

cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure on the issue of whether Nationwide breached the contract. Defendants also declare that their tort claims are trial-worthy; Plaintiff argues they should be dismissed.

## II. Legal Standard

"The standard of review of a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same as that for a motion to dismiss under Rule 12(b)(6)." Marrero-Gutierrez v. Molina, 491 F.3d 1, 5 (1st Cir. 2007). "[T]o survive a motion to dismiss (or a motion for judgment on the pleadings), the complaint must plead facts that raise a right to relief above the speculative level." Citibank Global Markets, Inc. v. Rodríguez Santana, 573 F.3d 17, 23 (1st Cir. 2009). "In reviewing a motion under Rule 12(c), as in reviewing a Rule 12(b)(6) motion, [the court] may consider documents the authenticity of which are not disputed by the parties; documents central to plaintiffs' claim; and documents sufficiently referred to in the complaint." Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (quotation marks, citation and internal alterations omitted).

The dispute here turns on the interpretation of a contract under Rhode Island law.  In general, the Court's "primary task . . . is to attempt to ascertain the intent of the parties.  In ascertaining the intent, we must look at the instrument as a whole and not at some detached portion thereof."  Colonial Penn Ins. Co. v. Mendozzi, 488 A.2d 734, 736 (R.I. 1985) (quoting Woonsocket Teachers' Guild, Local 951 v. School Comm. of Woonsocket, 367 A.2d 203, 205 (R.I. 1976)) (alterations omitted).

III. Contract Claims

Neither part of the termination clause cited by Nationwide authorized escaping the contract.  Therefore, Nationwide's request for a declaratory judgment must be rejected, and the Steiners succeed on their claim for breach of contract.

A.   The "Other Contracts" Provision

Nationwide's reliance on the "other contracts" language in the termination clause falls flat, for two reasons.  First, the Steiners propose a reasonable interpretation of the clause that requires construing the policy against the insurer.  Second, accepting Nationwide's argument would mean the contract was illusory.

1.   The "Other Contracts" Provision Is Ambiguous

Nationwide proclaims that the "other contracts" provision confers broad authority on it to terminate contracts.   If, after selling an annuity, it "discovers that the risk it intended to assume in issuing [the policy] has been altered" because it sold any "other contracts . . . to cover [the] life" referenced in the first annuity, it may revoke either.   (Steiner annuity at 7-8.)   It does not matter when or in what sequence the two annuities were issued, or whether Nationwide could or should have known it was entering two contracts based on the same annuitant. This is because Nationwide's "failure to detect, mitigate or eliminate altered risk," such as a second annuity based on the same life, does not waive its rights.   (Id. at 8.)

The Steiners argue the termination clause cannot be that sweeping.   They pinpoint a flaw in Nationwide's interpretation arising from the need to harmonize the termination clause with the rest of the contract.   The introduction to the termination clause explains, "[t]his Contract is not intended for use . . . by someone trying to cover a single life with multiple Nationwide contracts." (Id. at 7.)   However, a separate provision, titled "purchase payments," states:

> [T]otal cumulative [p]urchase [p]ayments under the Contract _and any other annuity contract issued by Nationwide with the same Annuitant_ may not exceed $1,000,000 (and will be returned to the Contract Owner), unless Nationwide agrees in writing to accept [payments] exceeding $1,000,000.

(_Id._ at 11 (emphasis added).)   Without question, this clause contemplates multiple contracts on the same life. Otherwise, there would be no reason to mention "any other annuity contract issued by Nationwide with the same [a]nnuitant." (_Id._)

This creates a puzzle: how can Nationwide not "intend[]" to offer "multiple . . . contracts" on a single life, and yet at the same time anticipate "other annuity contract[s] . . . with the same [a]nnuitant?" (_Id._ at 7, 11.)   The Steiners' answer is that the termination clause only applies when one person buys several annuities on the same life.   It does not, they say, apply when two or more people each buy an annuity on one life.   The termination clause specifies that the annuity is not intended for "_someone_ trying to cover a single life with multiple . . . contracts" — in other words, a single owner of those contracts.   (_Id._ at 7 (emphasis added).)   With that in mind, the best view of the purchase payments clause is that it envisions multiple owners of contracts on the same life,

but not single owners.  This averts any collision between the two clauses.

Under this view, the two clauses together mean that Nationwide permits multiple contracts on a life as long as the owners are different.  The Steiners contend that since they do not own the second Stroup annuity, it did not trigger the "other contracts" provision in the termination clause.

Nationwide responds by highlighting the operative terms of the termination clause.  It cites the "common principle of contract construction . . . that a specific term will control over a conflicting general term." Newharbor Partners, Inc. v. F.D. Rich Co., 961 F.2d 294, 299 (1st Cir. 1992) (noting that specific terms control over conflicting general terms).  Thus, Nationwide continues, the general rationale for reserving revocation rights stated in the introduction to the termination clause cannot trump the specific privileges granted in subparagraph (2).  See Gulf Oil Corp. v. Fed. Power Comm'n, 563 F.2d 588, 598 (3d Cir. 1977) ("[A] recital in a preamble, although part of the contract, must give way in case of conflict with the operative provisions of a contract.").  That paragraph refers to Nationwide's

discovery that "[t]he Contract is being used with other contracts issued by Nationwide to cover a single life or risk." (Steiner annuity at 8.)  It does not make any distinction between single owners and multiple owners. Therefore, Nationwide concludes, it does not restrict the grounds for termination to one or the other, notwithstanding the reference to "someone" in the introduction.

The purchase payments clause is even less relevant to the meaning of the "other contracts" provision, according to Nationwide.  It addresses the distinct topic of Nationwide's right to limit the total risk on a life.  Any tacit authorization of multiple contracts on a life in that clause, Nationwide reasons, can have no effect on its "discretionary right to terminate if multiple contracts are issued on the same annuitant." (Pl.'s Opp. to Def.'s Mot. 18-19.)

These arguments have some plausibility, but cannot withstand the Steiners' attack.  The rule of "contra proferentum," which means "against the drafter," requires this Court to "construe ambiguous terms in an insurance contract in favor of the insured." Open Software Found., Inc. v. U.S. Fidelity & Guar. Co., 307 F.3d 11, 17 (1st

Cir. 2002); see Zifcak v. Monroe, 249 A.2d 893, 896 (R.I. 1969) ("[I]f the terms of an agreement are doubtful and uncertain, they shall be construed most strongly against the author thereof."); accord Lifespan/Physicians Prof'l Servs. Org., Inc. v. Combined Ins. Co. of Am., 345 F. Supp. 2d 214, 222 (D.R.I. 2004) (denying summary judgment to insurer where language was ambiguous and contra proferentum doctrine applied).

There is no escaping the conclusion that the "other contracts" provision is ambiguous in light of the purchase payments clause. The Steiners' reading of the annuity is, at a minimum, equally plausible to Nationwide's. See Sea Fare's Am. Café, Inc. v. Brick Market Place Assoc., 787 A.2d 472, 476 (R.I. 2001) ("A contract is ambiguous if . . . it is reasonably susceptible of different constructions.") (quotation marks and citation omitted). Their view dispels any conflict between the termination clause and the purchase payment clause. This works in their favor, given that the Court should strive to make sense of the "instrument as a whole." Colonial Penn, 488 A.2d at 736. True, Nationwide's interpretation is more faithful to the language of the "other contracts" paragraph, which says nothing about single or multiple

owners.   But walking through Nationwide's argument step by step also reveals a glitch in its logic.

Nationwide maintains that it possesses a "discretionary right to terminate" multiple contracts on an annuitant.  (Pl.'s Opp. to Def.'s Mot. 19.)  It also does not dispute that the purchase payments clause nevertheless allows it to "agree[] in writing to accept [payments] exceeding $1,000,000" on multiple contracts on the same life.  (Steiner annuity at 11.)  The number of owners, it says, makes no difference under either provision.  If this is the case, Nationwide has the ability to allow or disallow multiple contracts on a life, to one or more owners, in its sole discretion.  There are two defects in that theory.  First, it ignores the use of the word "someone" in the introduction to the termination clause, silently converting it to "anyone."  Second, it fails to explain the purpose of the introduction to the termination clause.  That is, why say the annuity is not "intended for use . . . by someone trying to cover a single life with multiple . . . contracts" if Nationwide intends to permit such use on a case-by-case basis?  (Steiner annuity at 7.) Nationwide could have eliminated ambiguity by deleting the introduction altogether, but it is now stuck with it.

Consequently, the introduction to the termination clause creates a reasonable alternative to Nationwide's interpretation of the "other contracts" provision. The Court must therefore reject Nationwide's proposal, and apply the contract in accordance with the Steiners' understanding. Accordingly, because the second Stroup policy belongs to a different owner, the "other contracts" clause did not entitle Nationwide to revoke the Steiners' annuity.

> 2.   Nationwide's Interpretation Renders the Contract Illusory

The second flaw in Nationwide's interpretation is that, if correct, there was never a real contract. Nationwide attests that the only prerequisite to termination is issuing more than one annuity on a single life. The sequence in which Nationwide sells the policies is irrelevant. So too is whether Nationwide knows or should know there is an outstanding annuity based on the same life at the time of the second sale: "failure to detect . . . altered risk" has no effect on termination rights. (Steiner annuity at 8.) Thus, at any time after issuing the second contract, Nationwide says, it may invoke the termination clause against either the first or the

second buyer.  But this proves too much: if Nationwide can
cancel the annuity based on its own subsequent action, then
it was never contractually bound to anything.

The Steiners argue persuasively that if Nationwide is
correct, its "promises" were "illusory since [it] reserved
the unfettered discretion to thwart" the agreement "by
unilaterally invoking" the termination clause.  Centerville
Builders, Inc. v. Wynne, 683 A.2d 1340, 1341 (R.I. 1996).
The question is whether the termination provision provides
sufficient "limits and restrictions constituting the
necessary legal detriment of consideration and conditions
so as not to render the agreement illusory."  Holliston
Mills, Inc. v. Citizens Trust Co., 604 A.2d 331, 336 (R.I.
1992).  Nationwide points to the "grounds specified in the
termination provision" — meaning the "other contracts"
clause — as sufficient limitations.  (Pl.'s Opp. to Defs.'
Mot. 22.)  However, as the Court discussed above, in
explaining what the "other contracts" clause means,
Nationwide itself cites only one condition to termination
entirely within its own control: the sale of two policies
on one life.

In effect, Nationwide has in its argument disavowed
any "limitations [or] restrictions" that would forge a

binding agreement under its view of the annuity.  Holliston
Mills, 604 A.2d at 336.   To be clear, the Court's holding
is that Nationwide breached the contract and must pay the
death benefit; the foregoing discussion merely illustrates
that Nationwide would end up in a similar position if the
Court accepted its contention: the Court would have to
rescind the agreement, rather than let Nationwide exercise
the remedies in the termination clause.  Centerville
Builders, 683 A.2d at 1342 (explaining that the lack of an
enforceable contract requires rescinding the purported
agreement).

     B.   The Blank Application Question

     Nationwide next claims the Steiners' failure to state
the beneficiary's relationship to Stroup on the annuity
application activated Nationwide's termination rights.   It
fares no better in this effort, because it waived the right
to challenge any omission in the application when it issued
the policy.

     Subparagraph (1) of the termination clause allows
Nationwide to revoke the contract if "[i]nformation
provided by the Contract Owner(s) is materially false,
misleading, incomplete or otherwise deficient." (Steiner
annuity at 7.)   The Court will assume, for the sake of

argument, that the Steiners' admitted lack of any pre-existing relationship to Stroup was material information.[2] A full and truthful answer to that question would have revealed what Nationwide says it needed to know: the Steiners did not know Stroup before buying the annuity, and only used her as an expedient for their investment.   The question thus zeroed in on what Nationwide says created "altered risk" under the termination clause.

The Steiners left the space next to that question blank, but Nationwide did not follow up.   Instead, it accepted the Steiners' purchase payment of $1 million and issued the policy.   The Court agrees with the Steiners that, by doing so, Nationwide waived the right to rely on the blank application question as a basis for termination under the "incomplete or otherwise deficient" information provision.   Under Rhode Island law, an insurer waives the

---

[2] In debating whether Sheila Steiner's relationship to Stroup is material, the parties dispute whether an annuity owner must have an "insurable interest" in the annuitant. In the Western Reserve cases, the Court concluded that Rhode Island's insurable interest rule applies to insurance, but not annuities.   Western Reserve Life Assurance Co. of Ohio v. Conreal LLC, C.A. Nos. 09-470 S, 09-471 S, 09-472 S, 09-473 S, 09-502 S, 09-549 S, 09-564 S, --- F. Supp. 2d ---, 2010 WL 2222409, (D.R.I. June 2, 2010).   That issue, however, is not relevant here, because the terms of the contract would require finding for the Steiners even if there were an applicable insurable interest requirement.

right to deny coverage by accepting a premium payment "with full knowledge" of grounds for not fulfilling its obligations under the policy. Imperial Cas. & Indem. Co. v. Bellini, 888 A.2d 957, 963-64 (R.I. 2005). Similarly, the First Circuit has recognized that "an insurer may lose its right to rescind the coverage of an insurance contract if it knows of the facts that may warrant rescission and fails to disclaim within a reasonable time, or if it acts in any way inconsistent with an intention to disclaim." Gen. Star Indem. Co. v. Duffy, 191 F.3d 55, 59 (1st Cir. 1999).

Nationwide objects that it lacked "full knowledge" of the particular facts that the Steiners omitted, which of course cannot be disputed. That, however, does not salvage its termination rights. The question is whether an insurer must honor its policy when the application was incomplete, but the insurer retained the premium and delivered the contract anyway. The vast weight of authority binds insurers to their commitments in this situation. See 6 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 85:18 (3rd ed. 2005) ("When the information supplied by the insured is obviously not satisfactory or adequate, the acceptance thereof by the insurer without a protest is a

waiver of the requirement of a complete or full answer.");
Pete Roy Ford, Inc. v. Lachney, 390 So.2d 248, 249-50 (La.
Ct. App. 1980) ("[I]f the insurer intends to rely on the
[in]formation . . . called for in the blanks provided, it
is its duty to make sure that the blanks are filled in
properly; otherwise, the information called for is
waived."); Leonardo v. State Farm Fire & Cas. Co., 675
So.2d 176, 178 (Fla. Dist. Ct. App. 1996) ("[A]n insurer
who accepts an application which is not fully completed
accepts that application at its risk."); Mattia v. N. Ins.
Co. of N.Y., 114 A.2d 582, 586 (N.J. Super. Ct. App. Div.
1955) ("The defendant accepted plaintiff's premium money
and filed away his patently deficient application blank
without any indication to plaintiff of dissatisfaction
therewith or disclaimer of coverage . . . . In such a case
waiver by the insurer will be inferred."); Liberty Hall
Ass'n v. Housatonic Mut. Fire Ins. Co., 73 Mass. 261, 265,
1856 WL 3288, at *5 (Mass. 1856) ("The defendants, having
issued the policy without requiring any answer to the
eleventh interrogatory contained in the application . . .
it was fair to infer that they waived information on that
point . . . [and] they cannot now avoid the policy.");
Bloom v. Wolfe, 547 P.2d 934, 937 (Colo. Ct. App. 1976)

("It is well established that when an insurer accepts an application for insurance with an unanswered question, liability cannot be denied on this ground."). But see Chicago Ins. Co. v. Kreitzer & Vogelman, 265 F. Supp. 2d 335, 344 (S.D.N.Y.,2003) ("The Defendants argue that [the plaintiff] essentially avoided knowledge with its failure to investigate why [the defendant] did not answer the pertinent questions on the applications. Such argument is unavailing. An insurer is not required to verify or investigate information provided by an insured.").

The Rhode Island Supreme Court has not addressed this issue. However, it is no stretch to conclude it would follow the general rule, given that it already recognizes insurers may waive the right to litigate coverage by accepting premiums with knowledge of the basis for a dispute. See Bellini, 888 A.2d at 963-64. The Court therefore concludes that Rhode Island law supports a finding of waiver in these circumstances.

As a second line of defense against such a finding, Nationwide falls back on the last paragraph of the termination clause. It states, "Nationwide's failure to detect, mitigate or eliminate altered risk does not act as a waiver of its rights and does not bar Nationwide from

asserting its rights at a future date." (Steiner annuity at 8.) Nationwide did not figure out the Steiners had no relationship to Stroup, other than through the annuity, until after they sought to redeem the death benefit. This, it claims, was a "failure to detect" altered risk, which preserves its termination rights under the no-waiver provision quoted above.

The no-waiver clause cannot fix Nationwide's mistake. It does not fit either of the two potential reasons that Nationwide accepted the Steiners' incomplete application. The first is that Nationwide decided the information it had requested was unimportant. If that is true, Nationwide did not "fail to detect" the unanswered question — which, truthfully answered, would have revealed exactly what Nationwide now says it should have been told. It just judged the absence of a response to be irrelevant to its underwriting, and chose not to follow up.

The second possibility is that no one at Nationwide read the application. It would be absurd to characterize this as a "failure to detect." The ordinary meaning of "detect" is "to discover the true character of," or "to discover or determine the existence, presence, or fact of." Merriam-Webster's Collegiate Dictionary 314 (10th ed.

2002).  The unanswered question was obvious on the face of the application.  There was no need to "detect" the blank space, or discover its "true character" or "existence."  Put differently, the "failure to detect" clause cannot protect Nationwide for ignoring the answers, or lack of answers, to questions it asks.[3]

For these reasons, the Steiners' omission also did not empower Nationwide to invoke the termination clause.[4]

---

[3]  Rather, fairly read, that provision relieves Nationwide from having to investigate vague, ambiguous, misleading, or incomplete answers to its questions — as opposed to application forms that are incomplete as a whole because some questions are just left blank.  For instance, if the Steiners had written that Stroup was a "business associate" of Sheila Steiner, that statement would arguably misrepresent the facts if they had no dealings with her other than through the annuity itself.  In that circumstance, if Nationwide granted the application without further investigation, it might be able to rely on the "failure to detect" clause to argue it had not waived termination rights.

[4]  Even if the Court had interpreted the nonwaiver clause in Nationwide's favor, it might still have found that Nationwide lost the right to rely on that provision.  See Miller v. Phoenix Assur. Co., Ltd., of London, 191 P.2d 993, 996 (N.M. 1948) (finding waiver in the face of nonwaiver agreement because insurer did not act in accordance with terms of nonwaiver provision); Blair v. Nat'l Reserve Ins. Co., 199 N.E. 337, 338 (Mass. 1936) ("[A] company cannot contract itself out of the legal consequences of its subsequent acts.").

C.    Remedy

Since Nationwide had no authority to terminate the annuity, it is liable for breach of contract to the Steiners.   "[I]t is well settled that a court may award damages for breach of contract to place the injured party in as good a position as if the parties fully performed the contract."   Guzman v. Jan-Pro Cleaning Sys., Inc., 839 A.2d 504, 508 (R.I. 2003) (quotation marks, citation, and internal alteration omitted).   The Steiners were entitled to receive the death benefit provided for in the annuity. Nationwide admits the Steiners' allegation that the death benefit totals approximately $1,059,685.48.   (See Pl.'s Reply to Counterclaim ¶ 17.)   It thus appears there is no material factual dispute about damages.[5]   However, the Court is willing to entertain any submissions the parties may wish to make on this point.   Accordingly, they are granted

---

[5] Nationwide cites equitable principles that it claims would prevent making it bear the full market loss on the Steiners' policy in the event of rescission.   Because the Court is not rescinding the contract, but instead enforcing it, those principles are not relevant.   The Court also notes that the Steiners' requests for pain and suffering and punitive damages are not viable because their bad faith and tort claims are dismissed.   Cf. Bibeault v. Hanover Ins. Co., 417 A.2d 313, 319 (R.I. 1980) (explaining that an insurer's bad faith entitles a plaintiff to "consequential damages for . . . emotional distress").

thirty days in which to either stipulate to damages or explain the need for any additional briefing or evidence.

VI.  The Steiners' Tort Claims

The Steiners offer little to rebut Nationwide's challenge to their tort counterclaims.  First, Nationwide insists it cannot be liable for bad faith because its position is "fairly debatable."  Imperial Cas. & Indem. Co. v. Bellini, 947 A.2d 886, 894 (R.I. 2008) ("[A]n insurer is entitled to dispute a claim when it is 'fairly debatable.'").  The need for this Opinion explaining why the termination clause does not apply demonstrates that Nationwide is correct.  The bad faith claim must therefore be dismissed.

Next, the Steiners' tortious interference claim does not work because there is no contract at issue other than the annuity between the Steiners and Nationwide.  While Nationwide breached that agreement, it cannot tortiously interfere with its own contract.  See URI Cogeneration Partners, L.P. v. Bd. of Governors for Higher Educ., 915 F. Supp. 1267, 1289 (D.R.I. 1996) ("[T]ortious interference with contract applies only to parties outside the agreement.") (emphasis in original).  Last, the Steiners have not plead extreme and outrageous conduct, physical

symptoms, or behavior "exceeding all possible bounds of decency," as they would have to for an intentional infliction of emotional distress claim. Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1021 (1st Cir. 1988). These two claims therefore must be dismissed as well.

V.   Conclusion

For the reasons stated above, the Court DENIES Plaintiff's motion for judgment on its declaratory judgment claim, but GRANTS Plaintiff's motion to dismiss Defendants' bad faith and tort counterclaims. It GRANTS Defendants' motion for judgment on the pleadings with respect to their breach of contract counterclaim, and DENIES their motion in all other respects. The parties shall inform the Court by letter whether they intend to stipulate to damages or dispute that issue within thirty days of the entry of this Order; Judgment shall issue after damages are determined.

IT IS SO ORDERED.


*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  July 13, 2010